FILED
2014 Apr-30  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

KEITH KARLSON,

      Plaintiff/Counter-claim
      defendant,

vs.                      CASE NO. CV-11-J-1511-NE

RED DOOR HOMES, LLC,
et al.,

      Defendants/ Counter-claim
      plaintiffs.

## MEMORANDUM OPINION

### I.  Procedural History

On March 14, 2014, the Eleventh Circuit Court of Appeals vacated this court's Memorandum Opinion and Order of May 16, 2012, and remanded the case "for further proceedings consistent with" the Court's opinion (doc. 64).  Because the Eleventh Circuit concluded this court granted summary judgment on grounds not briefed by the parties and without notice to the parties, the court provided the parties an opportunity to brief solely the issue of implied license, as instructed by the Eleventh Circuit.  *See* docs. 69, 70, 75, 78, and 85.  The specific question is whether defendants' use of plaintiff's renderings of defendants' new home plans violated plaintiff's claimed copyright in said renderings.

Defendants sought summary judgment on plaintiff's claim of copyright infringement and the court, finding that a non-exclusive implied license was created for defendants' use of plaintiff's renderings, granted summary judgment in defendants' favor on that issue, among others.[1]  *See* Memorandum Opinion and Order of May 16, 2012 (docs. 55 and 56).  However, the Eleventh Circuit, being of the opinion that the parties were not aware that the court might rule on the defendants' motion for summary judgment on the plaintiff's claim of copyright infringement by examining whether some type of license was granted by the plaintiff to the defendants, vacated the court's opinion. Now having the benefit of the parties' respective briefs on the issue of implied license, this court's opinion as to the merits of the plaintiff's claims is unsurprisingly, unchanged.  Because the court, with the benefit of evidence submitted by the parties, previously set forth detailed factual findings, the court adopts the facts previously found and restates only those undisputed facts relevant to the issue before it.

---

[1]The court granted summary judgment in defendants' favor on all counts of the plaintiff's complaint, and granted summary judgment in the plaintiff's favor on each of the defendants' counterclaims.  Defendants did not appeal this court's finding in plaintiff's favor on their counterclaims, and therefore those claims are no longer before this court.

## II. Factual Background

Plaintiff creates renderings of new home plans for marketing purposes.[2] Plaintiff depo. at 20, 24 (submitted as doc. 37, exhibit B).   Defendants Red Door Homes, LLC ("Red Door"), and SMA Operations Management, LLC ("SMA"), design new homes.  Patrick Miller depo. at 51 (submitted as doc. 37, exhibit A). SMA sells home plans and drawings to builders "on demand," including plaintiff's renderings, if requested by builders, whereas Red Door provides software estimates and building packages, including access to the renderings, to its licensees, who sell the plans to builders.  Declaration of Miller, ¶¶ 3-6 (submitted as doc. 37-2).

Plaintiff and non-party Patrick Miller had previously worked together, with Miller designing new homes and calling on plaintiff for renderings should the same be sought by a builder.  Miller first began designing homes for SMA in 2000 or 2001. Miller affidavit (doc. 37-2), ¶ 6.  When Miller was hired as a full-time employee of SMA to design homes in 2008, plaintiff was hired by the defendants as an independent contractor, on a "per design" basis, to create renderings of new home designs.  He was paid a set dollar amount for each of the renderings he created. Miller depo. (doc. 37-1) at 57, 87.

---

[2]These are colored pictures of what a home design will look like when built, created from elevations, floor plans and/or blue prints.

The plaintiff asserts he has claimed a copyright interest in his renderings since he began working with Miller in 1998.  Plaintiff depo. (doc. 37, exhibit B) at 35-36.  When Miller joined SMA and retained plaintiff as an independent contractor to produce renderings in April 2008, the plaintiff placed copyright language on each invoice he sent to defendants.  Karlson affidavit (doc. 70-3), ¶ 11.  The language added stated plaintiff transferred "a limited copyright to reproduce the artwork ... in unlimited quantities ... royalty free, but only for use directly by you and may not be transferred to another business entity without my expressed permission...."  See e.g., defendants exhibit M (doc. 37-2).  Nothing was said about the language by either the plaintiff or the defendants until November 2009 when a dispute arose over whether plaintiff should be paid for redoing a rendering upon request by the defendants.[3]  Karlson affidavit (doc. 70-3), ¶ 13.

The court has again examined the evidence before it concerning the parties' agreement.  Taking the evidence in the light most favorable to the plaintiff, the court finds as follows:

---

[3]In his earlier deposition, the plaintiff testified that his December 16, 2009, email to defendants was possibly the first instance where he discussed his copyright declaration with the Red Door entities. Plaintiff depo. at 134-135, submitted as exhibit B to defendants' motion (doc. 69-2). This was also the date that plaintiff first applied for copyright registration.  *Id.* at 135.  His copyright issued with a registration date of  December 18, 2009.  *Id*.  Plaintiff did not actually receive the copyright until 2011.  *See e.g.* defendant exhibit P (doc. 37-2).

The plaintiff knew when he created the renderings that SMA was never the end user of the renderings.  *See* Karlson depo. at 75-76 (doc. 37, exhibit B).  However, plaintiff claims that he never intended for SMA to distribute his work and that the same was done without his knowledge. In November 2009 the plaintiff sent defendants an email outlining his terms for payment and royalties if they wished to continue to use his services and renderings.  *See* defendants exhibit Q (doc. 37-2). The plaintiff alleges he misunderstood the nature of the Red Door business, but upon learning that his artwork was being provided to licensees, he believed he was entitled to royalties based on the number of builders using the plans.  *Id.*  Defendants responded this was not their agreement and the same would not be a good business model for them.  *Id.*  Defendants also told plaintiff he could continue doing renderings for a "one time" price, but if he declined, they would find someone else to perform this service.  Plaintiff responded that defendants could not use any of his artwork anymore.  *Id.*

Plaintiff argues that "Miller understood and intended that the terms of the sale between [plaintiff] and Red Door Homes would be the same as Karlson and Miller had used during their nearly decade long business relationship."  Plaintiff's brief (doc. 70), at 3.  The court can find no evidence which supports this assertion by the plaintiff of Miller's understanding and intent.  The excerpt from Miller's deposition

that plaintiff cites as proof of what Miller intended as the manner in which Red Door

Homes would utilize plaintiff's renderings does not state what plaintiff represents to

the court.  The entire page cited by plaintiff in support of this representation reads as

follows:

> Q.  All right.  Would you then sell or would these plans and designs that you had made then be sold to builders, or how – how did ADG make any money.
>
> [Miller].  ADG – ADG as an entity never made any money.
>
> Q.  Okay.  How was it supposed to make money?
>
> [Miller].  Keith was supposed to make money if somebody wanted a rendering.  I would make money on my plans.
>
> Q.  To your knowledge, did ADG ever sell any renderings or plans to any builders or prospective home buyers?
>
> [Miller].  AD – I don't sell to home buyers.  I deal with builders.
>
> Q.  All right.
>
> [Miller].  I sold drafting and design consultation to homebuilders, and if they asked me if there were renderings available, I would tell them that I had a – a resource to do such.

Plaintiff ex. 70-5, at 51.

This excerpt of Miller's deposition has absolutely nothing to do with regard to

Miller and Karlson's understanding as to how Red Door would utilize plaintiff's

renderings, and certainly does not support a representation that Red Door would not

have the right to sell plaintiff's renderings without paying him an additional fee on top of the fee it paid plaintiff to create the rendering.   The only conclusion that testimony supports is that prior to working for Red Door, Miller created home designs.  If a builder also wanted a rendering, Miller informed the builder that he could have one made.  Thus, plaintiff's claim of an "oral agreement confirming that the terms of the sale would be the same as Karlson and Miller had used throughout their business and partnership together" (plaintiff's brief (doc. 70), at 3), as evidenced by this page of Miller's deposition is a gross misrepresentation as to its content.[4]

Even assuming the plaintiff had provided any evidence of an agreement between him and Miller that "the terms of the sale would be the same as Karlson and Miller had used throughout their business and partnership together" (plaintiff's brief (doc. 70) at 3), the plaintiff also failed to prove what those prior terms were.  In plaintiff's affidavit, he asserts that ADG demanded and received payment from each

---

[4]This problem of either misunderstanding the difference between argument and evidence, or intentionally misrepresenting argument as evidence, pervades the plaintiff's brief.  Another example of this inability to separate fact from argument appears in plaintiff's brief as follows:

> ...since the copyright limitation contained in the invoices became known to Miller and Red Door Homes prior to the agreement and no later than their receipt of the first invoice, and it could be concluded that said term was well understood by all parties to be a part of the twenty-two subsequent transactions initiated by Red Door Homes."

Plaintiff brief (doc. 70), at 11.

Plaintiff cannot under any circumstances establish through his own affidavit or brief what was known to Miller and Red Door Homes.  He cannot under any circumstances use his own testimony to establish what "was well understood by all parties..."  This is inadmissible hearsay and the court may not consider it upon motion for summary judgment.  *See e.g., Macuba v. Deboer*, 193 F.3d 1316,1322-23 (11th Cir.1999).

homebuilder who received one of his renderings.  Plaintiff affidavit (doc. 70-3), ¶ 6.  However, plaintiff does not allege that prior to a request for a rendering by a home builder, ADG also paid plaintiff to produce the rendering for marketing purposes.  Nor does he assert that he was paid multiple times for producing one rendering.  At most, this affidavit statement establishes that in providing renderings for ADG, upon the first request for a rendering, plaintiff was paid for creating it.  Such a finding is supported by plaintiff's deposition testimony, where he was asked "...you didn't bill Mr. Miller one time and then get paid (sic) a second time when the client or customer that Mr. Miller may have sold it to paid for a rendering, you got paid one time, right?"  The plaintiff responded, "In my work, in our work under – as ADG, yes, that's true."  Plaintiff depo. at 104 (exhibit A to defendant's motion to strike (doc. 74-1)).

The only factual finding supported by this evidence is that plaintiff and Red Door Homes followed a different business model than plaintiff and Miller did with ADG, because Red Door Homes paid plaintiff to create renderings even if they were never requested by a client or customer.  Thus, plaintiff's argument that Red Door should have paid him each time it sold a building plan, based on how he previously did business with Miller and ADG, lacks any evidentiary support.  The fact that plaintiff chose to sell his renderings to a reseller of home designs (Red Door) instead

of the builders directly does not create evidence of an agreement with Red Door to pay plaintiff in any manner other than how he was compensated.[5]

The court finds from the evidence before it that the parties agreed that defendants would request plaintiff create renderings based on defendants' home plans and defendants would pay plaintiff for the same.  Plaintiff created the renderings. Defendants paid plaintiff the agreed upon price per rendering.  Neither party disputes that this was the sum and substance of the parties agreement.  The sole dispute is a question of what defendants could do with the renderings after paying the plaintiff to create them.[6]

### III. Standard of Review

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  "An issue is 'material' if it is a legal

---

[5]The evidence is undisputed that the plaintiff was paid for every rendering he created for Red Door based on the invoices submitted.  Plaintiff depo. at 181 (exhibit B to doc. 69).

[6]The Eleventh Circuit found in its unpublished opinion that "Defendants licensed Karlson's illustrations to third parties without Karlson's knowledge or permission.  After learning of the Defendants' actions, Karlson filed an application for copyright on his illustrations and demanded that the Defendants compensate him for his illustrations they had licensed to third parties. Defendants refused to compensate Karlson and continued licensing his illustrations."  Eleventh Circuit Opinion of March 14, 2014, at 3 (doc. 64).  Unfortunately, the Eleventh Circuit provides no evidentiary citation for this finding and this court finds the evidentiary record before it devoid of evidence defendants "continued licensing [of plaintiff's] illustrations."

element of the claim under the applicable substantive law which might affect the outcome of the case.  It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609 (1970).  Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

"A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990) (citation omitted).  In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable.  *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986).  "Speculation does not create a genuine issue

of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 325, 106 S.Ct. at 2553.

The court must consider the evidence in the light most favorable to the non-moving party and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1311 (11th Cir. 2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## IV.  Legal Analysis

### A.  Implied License and Copyright Law

The parties do not dispute that the plaintiff obtained registered copyrights for his renderings in December 2009.  The defendants also do not dispute that the copyrights covered the renderings plaintiff created for the defendants.  Rather, the sole dispute is whether, given that copyright protection, the plaintiff impliedly granted the defendants a license to use those copyright protected works in furtherance

of their business.  "[U]nder federal law, a nonexclusive license may be granted orally, or may even be implied from conduct." *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997) (*quoting* 3 MELVILLE B. NIMMER & DAVID NIMMER (NIMMER) ON COPYRIGHT § 10.03[A], at 10-40, 10-41 (1997) ("When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license....")).

An implied license is created when (1) a licensee [Red Door] requests creation of a work; (2) the licensor [Karlson] makes that work and delivers it to the licensee; and (3) the licensor [Karlson] intends that the licensee [Red Door] copy and distribute his work. *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997); *Thorton v. J. Jargon Co.*, 580 F.Supp. 2d 1261, 1281 (M.D. Fla. 2008) (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 514 (4th Cir. 2002). The touchstone for finding an implied license is intent. *See John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). "Without intent [to permit the use], there can be no implied license." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). Courts have found implied licenses only in "narrow" circumstances when one party "created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990); see also *Korman v. HBC Fla., Inc.*, 182 F.3d 1291,

1293 (11th Cir. 1999) (determining that plaintiff gave defendant radio station implied, non-exclusive license to use jingles she had written for station); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) ("without such a license [to use], [the] contribution ... would have been of minimal value.").

"Because an implied license is an affirmative defense to a claim of copyright infringement, 'the alleged infringers have the burden of establishing an implied license.'" *Latimer v. Roaring Toyz, Inc*. 601 F.3d 1224, 1235 (11th Cir. 2010) (*quoting Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003)). Courts must look to objective evidence of the parties' intent in determining whether an implied license exists. *See Latimer*, 601 F.3d at 1235; *Wilchombe v. TeeVee Toon, Inc*., 555 F.3d 949, 956 (11th Cir. 2009).

The parties do not dispute that defendants requested plaintiff create the renderings, and provided him the information he needed to do so. Nor do the parties dispute that the plaintiff created the renderings and delivered them to the defendants. The sole dispute in the implied license analysis is whether the plaintiff intended that defendants use and distribute his artwork. Plaintiff grossly misunderstands the intent inquiry, repeatedly arguing to this court what he subjectively intended. Plaintiff's subjective intent is irrelevant. *See e.g., Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (interpreting the Federal Rules of Civil Procedure's personal

13

knowledge requirement to require more than affidavits based solely on "information and belief.").  Rather,

> [c]ourts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license. *See Wilchombe v. TeeVee Toons, Inc*., 555 F.3d 949, 956 (11th Cir.2009); *Gracen v. Bradford Exchange*, 698 F.2d 300, 303 (7th Cir.1983) (the scope of an implied license may be proven through parol evidence). In *Asset Marketing Systems, Inc. v. Gagnon*, the Ninth Circuit held that a copyright owner must express the intent to restrict the scope of a license when they deliver the copyright work. 542 F.3d 748, 756 (9th Cir.2008). Thus, an implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered.

*Latimer*,  601 F.3d at 1235.

"In determining whether an implied license exists, a court should look at objective factors evincing the party's intent, including deposition testimony, and whether the copyrighted material was delivered 'without warning that its further use would constitute copyright infringement.'" *Wilchombe*, 555 F.3d at 956 (*quoting I.A.E., Inc. v. Shaver,* 74 F.3d 768, 776 (7th Cir. 1996)); *Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 756 (9th Cir. 2008) ("The relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct.") (citing *Effects*, 908 F.2d at 55[8] n. 6 (noting that "every objective fact concerning the transaction" supported the finding that an implied license existed)). A copyright owner waives his right to sue for copyright

14

infringement while the non-exclusive license is in effect. *See Jacob Maxwell*, 110

F.3d at 753.

The court finds the facts of *Latimer* instructive.  In *Latimer*,

Kawasaki requested that Roaring Toyz customize ZX–14 motorcycles, and Roaring Toyz in turn asked Hathaway to apply custom paint and graphics to the motorcycles. Hathaway thus created the original artwork at Kawasaki's request. Hathaway knew the customized motorcycles, which sported his custom paint work, were to be used by Kawasaki to promote their new ZX–14 motorcycle.... Hathaway knew the customized motorcycles would be publicly displayed at Daytona Bike Week and photographed by the media. Hathaway also knew that both Kawasaki and Roaring Toyz sought as much media exposure as possible for the ZX–14 customization project. Thus, it is reasonable to infer that Hathaway intended that his artwork be photographed and distributed by Kawasaki, Roaring Toyz, and the media. At a minimum, Hathaway granted Kawasaki and Roaring Toyz an implied license to copy and distribute his original work.

*Latimer*, 601 F.3d at 1235-36.  The court continued

Like Hathaway, Latimer never executed a document granting an exclusive license in his work and Latimer's oral representations regarding the use of his photographs are disputed by the parties. However, Latimer's conduct satisfies all three prongs of the implied license test. Kawasaki requested that Roaring Toyz provide it with photographs of the customized ZX–14s, and Roaring Toyz in turn asked Latimer to create those photographs. Latimer thus created the photos at Kawasaki's request. Latimer's deposition testimony indicates that he knew Roaring Toyz would send the photographs to Kawasaki to create the placard. Thus, when Latimer delivered the photographs to Del Cioppo, he constructively delivered them to Kawasaki. In addition, Latimer also testified that he consented to Kawasaki's request to use the photographs in a "slide show or PowerPoint presentation or whatever is flashed up on a screen." Thus, Latimer granted Kawasaki an implied

license to use his photographs. Latimer created the photographs at Kawasaki's request, delivered the photographs to Kawasaki, and intended that Kawasaki use the photographs on a placard and in a screen presentation.

*Id.* at 1236.

Similarly, here defendants requested plaintiff to create artwork. Plaintiff knew the renderings were going to be used by defendants to promote their new home designs. Plaintiff knew the defendants were going to display his designs to their licensees and customers to encourage the purchase of the new home plans. Thus, it is reasonable to infer that plaintiff intended his artwork be distributed by the defendant. At a minimum, plaintiff granted defendants an implied license to copy and distribute his work. *See Latimer, supra; Falcon Enterprises, Inc. v. Publishers Service, Inc*., 438 Fed. Appx. 579, 581 2011 WL 2356788, 1 (9th Cir. 2011) (The parties' conduct demonstrates that Falcon granted Publishers an ongoing nonexclusive implied license to use its content for a fee.... Falcon's claim that Publishers needed an express license for each image that Publishers published is contradicted by the frequent and informal interactions between the parties)*; Asset Marketing Systems, Inc.,* 542 F.3d at 756 -757 (9th Cir. 2008) ("Under the circumstances, it defies logic that AMS would have paid Gagnon for his programming services if AMS could not have used the programs without further

payment pursuant to a separate licensing arrangement that was never mentioned in the TSA, and never otherwise requested at the time."); *IAE Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (holding a "non-exclusive license may be implied from conduct" where Shaver created work upon request, and handed it over intending that it be copied and distributed).

Although plaintiff protests this conclusion in his pleadings, his testimony and the other evidence contradict his arguments.  Plaintiff repeatedly testified in his deposition that he knew that it was the intention of Red Door Homes to provide the renderings to others and that he provided "clear permission for [Red Door] to sell the illustrations."  *See e.g.*, plaintiff depo. (doc. 69-2) at 82, 90, 93.  Plaintiff's bald assertion that there remains "a genuine issue of material fact relative to Karlson's intent that prevents summary judgment in favor of Red Door Homes" (plaintiff's sur-reply (doc. 78), at 4) continues to miss the important point that plaintiff's subjective

intent is not a matter the court may consider.[7]  Although plaintiff asserts that his subjective intent is relevant, he has provided no authority for his claim.

As in his original brief on the summary judgment motions, the plaintiff asserts his copyright statement on the invoices submitted to defendants protected his work. As the court found in its first Memorandum Opinion on the summary judgment motions (doc. 55), the invoices could not have formed part of the contract between the parties to produce the work because they were sent after the renderings were provided to the defendants.  *See e.g.*, plaintiff depo. at 139-140 (defendant exhibit B doc. 37)); defendant exhibit M (doc. 37), invoice dated April 8, 2008 for work ordered March 31, 2008, and delivered April 4, 2008, through April 7, 2008. Although the invoices contained language to the effect that by using his artwork, the defendants agreed to the terms listed in the invoices, the work was completed and sent to defendants prior to their receipt of each invoice.  Thus, any statement regarding use of the renderings in the invoices could not form the basis of an

---

[7]The factual representations contained in plaintiff's sur-reply are addressed by the court elsewhere.  The court merely notes once again that the plaintiff's evidence does not support the factual representations in his arguments, and that those representations range from misrepresentative to a complete disregard of plaintiff's and others' testimony under oath.  The court has taken the evidence itself at face value without judging its credibility, as the court must do.  *See e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  However, the court owes no such duty when considering arguments.  "For factual issues to be considered genuine, they must have a real basis in the record."  *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996).  Although the court draws inferences in favor of the nonmoving party at the summary judgment stage, the court does not have to draw favorable inferences " when the inferences that are drawn from the evidence ... are implausible." *Id.* at 743.

agreement between the parties concerning plaintiff's creation of those renderings. *See, e.g., Florists' Mutual Inc. Co. v. Lewis Taylor Farms, Inc.,* 2008 WL 875493, 9 n.8 (M.D. Ga. 2008) (*citing Sherman Foundry v. Mechanics, Inc.*, 517 S.W.2d 319, 322 (Tex. Civ. App. 1974) (holding that invoices did not alter the terms of the oral contract). *See also In re Charter Co.*, 913 F.2d 1575, 1580 (11th Cir.1990) (*quoting Preston Farm*, 625 S.W. 295, 299 (Tex. 1982)) (finding that invoices sent after the delivery of goods can only serve "as billing [statements] to show ... the total amount owed[;] [t]he basic contract for the sale of goods had already been formed an executed.") (alterations in original).[8]

_____

[8]Both in his initial brief (doc. 70), at 10 and in his sur-reply, at 8 n. 5 (doc. 78), plaintiff derides the court, suggesting that if the court had followed Alabama law instead of Texas law, it would have found that plaintiff could unilaterally alter the parties agreement by placing language in an invoice.  The court actually cited a case from the Middle District of Georgia for the proposition that an invoice cannot change the terms of an oral contract, which in turn relied on a Texas case for the same proposition.  *See  Florists' Mutual Inc. Co. v. Lewis Taylor Farms, Inc.*, 2008 WL 875493, *9 n.8 (M.D. Ga. 2008) (citing *Sherman Foundry v. Mechanics, Inc.*, 517 S.W.2d 319, 322 (Tex. Civ. App. 1974) (holding that invoices did not alter the terms of the oral contract)).  Indeed, the Eleventh Circuit has also cited to Texas cases for support for this position. *In re Charter Co.*, 913 F.2d 1575, 1580 (11th  Cir. 1990) (quoting *Preston Farm*, 625 S.W. 295, 299 (Tex. 1982)) (finding that invoices sent after the delivery of goods can only serve "as billing [statement] to show ... the total amount owed[;] [t]he basic contract for the sale of goods had already been formed an executed.").  Alabama case law does not imply otherwise, namely that a party can unilaterally change contract terms in a billing statement for work completed.  Plaintiff's citation to *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1198 (N.D. Ala. 2009), does not support his assertion otherwise.  The language plaintiff relies on from that case is that "[w]hile a contract may exist without a final comprehensive document in place, the parties must nevertheless agree on the material terms of the contract. This agreement may consist of 'several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract.'" *Id.* (citing *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 304 (Ala. 1986)).  It in no way suggests plaintiff can unilaterally change an oral agreement through language placed in an invoice.

The plaintiff offers no evidence that defendants ever agreed to be bound by the terms of his copyright language.   At no time prior to December 16, 2009, did the plaintiff discuss the content of the language with defendants.   Plaintiff depo. (submitted as doc. 74-1) at 134 ("it is possible this is the first time there was any serious discussion of it."); and 136-137 (where plaintiff testified that he added the copyright language without any discussion with Miller about it).   As the court found in its Memorandum Opinion of May 16, 2012,

> Plaintiff asserts the parties had a "binding agreement" concerning the use of plaintiff's renderings.  However, the only writings submitted to the court concerning any agreement demonstrates (sic) that once the plaintiff questioned what the parties' agreement was, they were unable to come to any agreement regarding the use of plaintiff's renderings by defendants, and ceased their business relationship.

May 16, 2012, Memorandum Opinion (doc. 55), at 15.

Drawing on the Court's language from *Asset Marketing*, "it defies logic" that defendants would pay plaintiff for his renderings if defendants could not use the renderings without further payments pursuant to a separate agreement that was not mentioned from April 2008 until December 2009.  *See Asset Marketing*, 542 F.3d at 756-757.  Based on the evidence, the court finds plaintiffs contention that defendants agreed to be bound by plaintiff's added language defies logic.  Any limits on the use

of the renderings necessarily had to be agreed upon prior to plaintiff agreeing to create the work and the defendants agreeing to pay for it.

Plaintiff argues that the use of his artwork by Red Door licensees violated his copyright in the renderings because Red Door had at least 70 of his renderings on its website for use and resale by its licensees and/or clients. Plaintiff depo. (doc. 37-1) at 50, 71, 135-136. Yet, prior to December 16, 2009, plaintiff never mentioned his belief that his work was copyrighted to Miller. *Id*. at 133. He never discussed his copyright declaration with Miller, instead adding such language to his invoices. *Id*. at 136-137. Plaintiff asserts defendants had to know he was claiming a copyright in the renderings because he put copyright language on each of his invoices, and thus "the copyright limitation contained in the invoices became known to Miller and Red Door Homes prior to the agreement and no later than their receipt of the first invoice, and it could be concluded that said term was well understood by all parties to be a part of the twenty-two subsequent transactions initiated by Red Door Homes." Plaintiff's brief (doc. 70) at 11. Such argument does not, and cannot, create a genuine issue of material fact. A nonmoving party, opposing a motion for summary judgment, cannot meet the burden of coming forth with relevant evidence by simply relying on legal conclusions or evidence that would be inadmissible at trial. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Plaintiff cannot, through a brief, create

evidence as to what defendants or non-party Miller "knew" as unsupported self-serving statements are insufficient to avoid summary judgment. *See e.g., Midwestern Waffles, Inc. v. Waffle House, Inc*., 734 F.2d 705, 714 (11th Cir. 1984).  Nor can plaintiff testify as to defendants' "specific knowledge of Karlson's understanding." *See* plaintiff's brief (doc. 70) at 11.

Even more problematic for plaintiff is that his arguments are wholly contradicted by his own deposition testimony.   The plaintiff testified that when he first began creating renderings for Miller, he would create the artwork and send an invoice.  Plaintiff depo. (defendant exhibit B (doc. 69)) at 34, 41.  At no time prior to 2009 did the plaintiff have any type of royalty agreement with Miller.  *Id*. at 40.

The plaintiff testified as follows:

Q.  All right.  So you understood that when you provided a rendering, whether it be an elevation, a floor plan or a plan option or one of these three other things, to Mr. Patrick J. Miller when he is asking on behalf of SMA Operations, that that in turn was going to be provided to these different companies, the ones you just mentioned, right?

A. Correct.  Mr. Miller would do a, not completely perfect job of informing me who  the end client was that was ordering the work, that I was doing the work for.

Q. Yes, sir.  But you understood it was going to be somebody else other than SMA, right, that was going to be using the rendering?

A.  Correct.

*Id*., at 75-76.

Q.  RDH, when Mr. Miller asked for a rendering from you on behalf of RDH, what did you think was going to happen to that rendering?

A.  I understood it to be used in their product line that they were selling to other homebuilders.

Q.  And how would it be used in the product line that they were selling to other homebuilders?

A.  I assumed it would be presented to potential clients and offered as part of the assets and services that Red Door Homes was advertising to those clients.

Q.  When you said it was offered as part of the assets that Red Door Homes was offering to the clients, what did you mean by that?

A.  Well, like any other enterprises, they offer to buy products and services to people who want to buy them.  And I assumed that my work, my illustrations, were part of the asserts that they wanted to market to their clients, to their potential clients.

Q.  I thought you testified earlier, not just that these were exemplars, but these were assets that Red Door Homes were selling to their clients. Are you changing that testimony?

A.  I don't understand.

Q.  Let me make sure I understand. Is it your testimony here today that Red Door Homes took the renderings that they got from you, by way of email, and sold them to their clients?

A.  Yes.

Q.  And you understood that before you sent the renderings to Mr. Miller, right?

23

A.  I understood that to be their intent.

Q.  Yes, sir.  They wanted to do that, right?

A. Correct.

Q.  And if they could find a willing buyer, that is, a client or customer of theirs, then that's what would happen, correct?

A.  Correct.

*Id*. at 76-78.

Q.  You knew that Red Door Homes – was Red Door Homes the entity that Mr. Patrick J. Miller was working for, were they actually building homes?

A.  I do not have enough information for that, to answer that question succinctly, but I do not believe they were.

Q.  You cannot state with certainty that they were, right?

....

A.  I cannot state with certainty that they were.

Q.  And you knew that it was the intention of Red Door Homes, when you provided those renderings to them, that Red Door Homes was, in turn, going to provide them to others, right?

A.  Correct.

Q.  And you knew that these others, to which these renderings were provided, they were the ones that were actually going to build homes, right?

A.  Correct.

24

*Id*. at 82-83.

> Q.  So it's your testimony here today that all you were giving the Red Door Homes entity, that is the first defendant here, Red Door Homes, LLC, the right to do was simply to show these renderings to other would be Red Door Home licensees, that is all you were giving them the right to do?

> A.  I will have to say no to that because I understood their business to be selling them, so certainly there was a clear permission for them to sell the illustrations along with the plans and their Red Door Homes services.

*Id*. at 90.

The plaintiff further testified that he knew when Red Door paid him for the renderings they were going to sell or otherwise provide them to the Red Door entities. *Id*. at 93.  When asked to provide images for advertising purposes, the plaintiff provided the renderings as requested.  *Id.* at 223.  He admits he was paid for creating the renderings by Red Door, knew the purpose for which he was providing the images and did not expect a second payment for these images when he provided them for a billboard.  *Id*. at 225.

Like the facts before the court in *Latimer*, the plaintiff provided images to the defendants knowing the defendants were planning to redistribute the same.  He provided the images directly to a billboard company knowing the images were going to be used for advertising on behalf of Red Door.  Given the plaintiff's deposition

testimony, the court again finds that based on the evidence before it, the relationship the parties created was one of a non-exclusive implied license from plaintiff to defendants.  As a marketing tool, the defendants paid the plaintiff to create renderings, and the plaintiff granted the defendants a permissive, non-exclusive license to use and reproduce his renderings.  *See e.g. Korman v. HBC Fla., Inc.,* 182 F.3d 1291, 1293 (11th Cir. 1999) (noting that a non-exclusive license can be implied from the conduct of the parties) (citing 17 U.S.C. § 204; *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 751–52 (11th Cir. 1997)).

Plaintiff's contention that he never intended to grant a license for the use of his renderings is simply not supported by objective evidence in the record.[9]  The plaintiff created renderings for defendants for more than a year prior to demanding multiple payments for creating one rendering.  Like the Court found in *Korman*, given

---

[9]Assuming the existence of a valid copyright, plaintiff's sole outlet for the renderings he produced for the defendants was the defendants themselves.  Defendants commissioned the plaintiff to produce these renderings as a marketing tool for their various home designs.  The renderings in and of themselves have no value and no market outside of defendants' home designs.  The plaintiff disputes this finding, asserting that defendants' customers would be his market for the renderings.  However, such an assertion is wholly theoretical, as plaintiff has no evidence that defendants' customers would be willing to pay plaintiff for renderings.  Plaintiff provides no proof that such a customer would not simply have the renderings created by a different artist should the same be deemed necessary, or even simply look at the renderings on Red Door's website, which use was clearly within the plaintiff's copyright language.  Rather, plaintiff's entire argument hinges on plaintiff's assertion that the defendants should have paid the plaintiff each time a licensee requested a rendering, in spite of having already paid the plaintiff to produce the rendering in the first place and in spite of any evidence that defendants ever agreed to do so.

his conduct, the plaintiff "cannot reasonably deny" that he granted defendants a non-exclusive license to use his renderings.  *Korman*, 182 F.3d at 1293.

Although  plaintiff asserts that "Red Door Homes was purchasing the right to reproduce the artwork only for use directly by Red Door Homes." (plaintiff's brief (doc. 70) at 14), plaintiff provides no explanation of what such use might encompass or why Red Door would have the renderings done if all it could do was make copies but not share them.  He asserts that even if he gave an implied license to Red Door to copy and distribute his drawings, that is a different question than whether Red Door had the authority to sell or transfer title to Karlson's renderings to its homebuilder clients.  *Id*. at 12.  As noted above, the court has no evidence before it that Red Door ever sold plaintiff's drawings to homebuilders.  At most plaintiff has produced evidence that his renderings appeared on defendants' websites.  However, the fact that defendants'  homebuilding customers "would have a need of marketing materials" does not make each "a potential customer for Karlson's renderings."  *Id*. at 13.  Rather, plaintiff would be but one of multiple possible avenues to have renderings done should a homebuilder want the same.[10]  In other words, if Red Door was not planning on redistributing plaintiff's drawings to homebuilders, a

---

[10]Plaintiff testified that he has never had an agreement similar to that which he claims here with any other client, and that it would be antithetical to their business to enter such an agreement. Plaintiff depo. (doc. 37-1) at 135-136.

homebuilder could pay someone else to create those same renderings. The value to defendants in the creation of the renderings was for the promotion of the home designs. The plaintiff's renderings were but a marketing tool to assist with the sale of the new home designs. Like any other marketing, while the format, layout and artwork may be the subject of a copyright, the intended use of marketing materials is exactly that manner in which defendants here used them. Moreover, the copyright language the plaintiff relies upon permits the defendants to use plaintiff's renderings in the manner about which plaintiff now complains. The copyright language appended to the invoices states:

> With delivery of your artwork, I transfer to you a limited copyright to reproduce the artwork I have produced for you in unlimited quantities on any media you choose, royalty free, but only for use directly by you and may not be transferred to another business entity without my expressed permission....

Defendants ex. M. (doc. 37-2).

> At his deposition, the plaintiff was asked:

> Q. ....have you seen anything were Red Door Homes, LLC, has specifically invoiced and sold the renderings that we're here about today to some other Red Door Homes branded entity?

> A. Specifically the renderings by themselves, no.

Plaintiff depo. (doc. 69-2) at 117.

Thus, the plaintiff offers nothing but speculation that his renderings were being sold, and even his speculation contradicts his deposition testimony.[11]   Evidence consisting of one speculative inference heaped upon another is entirely insufficient to defeat summary judgment. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).   Even if the court had not found plaintiff granted an implied license for the defendants to use his renderings in the manner they did, his own copyright language permits such use.   The court shall therefore, once again, grant the defendant's motion for summary judgment on plaintiff's claim for copyright infringement, as the grant of an implied license defeats any such claim.

---

[11]*See e.g.,* plaintiff's brief (doc. 70) at 13; ("[b]y selling Karlson's renderings to all of its homebuilder customers, Red Door Homes effectively killed any market for the renderings"); plaintiff's brief at 15 ("The specific infringement complained of is not only Red Door Homes copying of Karlson's renderings, or even its use of the renderings as marketing materials, but rather it also includes Red Door Homes (sic) sale of copies of Karlson's renderings to its customers...."); plaintiff's sur-reply (doc. 78) at 9 ("Red Door Homes was paid for these renderings by its customers, creating a second type of value to Red Door Homes as commodities to be sold..."). Missing from this argument is any citation to any evidence that Red Door sold any of Karlson's renderings.  Also missing is logic.  Red Door owns the home plans from which Karlson made his renderings.  Without those plans, the renderings are no more than pretty pictures of unbuilt houses. Therefore, plaintiff's assertion that "Karlson's market was not conceptually limited to only Red Door Homes" *(*plaintiff's brief (doc. 70) at 13) flies in the face of reality.  Although poorly stated, plaintiff seems to assert that his intent was that Red Door licensees would see his artwork at Red Door, purchase the home plans from Red Door, and then purchase a copy of the artwork for an additional fee.  However, there is no evidence  before the court that the plaintiff and defendants had any such agreement, and none of the parties' objective actions support a finding that this was in any way a part of their agreement.

**B.  *Revocation of the Implied License***

Having determined from the evidence that a non-exclusive limited license was objectively created by the parties, thus eliminating the question of copyright infringement, the court next turns to the question of when and if such permissive use was withdrawn.

Plaintiff argues that, assuming an implied license existed, he revoked his permission for use by his email of December 16, 2009.  In that email, plaintiff stated, "[w]hile advertisements already published and distributed will be excepted by necessity, all billboards, papers, or other signage and advertising utilizing my artwork that can reasonably be determined to be in the control of the organization benefitting from them must be removed, painted over, erased, or destroyed as soon as reasonably possible."  Defendant ex. Q (doc. 37-2).  Plaintiff further asserts that in the "smoking gun" email of January 26, 2010, defendants admit they are still distributing plaintiff's work.  *See* plaintiff brief (doc. 70) at 16.  That email states that defendants "will be making a wholesale change to the artwork used in advertising our homes as a result of a legal dispute with the contractor....  As a result we will be removing the renderings from the website and replacing them ASAP"  Plaintiff exhibit 8 (doc. 39-8).  That email continues

> Doug, please let me know what you currently have running and we will work with you to get those replaced with new artwork.  The reason Huntsville is of concern is due to contractor being from that Huntsville area.  Ads in other locations can run their course.

*Id*.  Plaintiff claims this is evidence of infringement after termination of any implied license.

Defendants respond that because defendants paid plaintiff for the renderings, the implied license was irrevocable.  Defendant's brief (doc. 69) at 21.  Plaintiff contends that once he revoked the license, defendants began infringing his copyrights by their continued use of his renderings.  Plaintiff brief (doc. 70) at 16.  Addressing a similar situation, the Fifth Circuit Court of Appeals ruled that

> A nonexclusive license may be irrevocable if supported by consideration. *See* 3 Nimmer, *supra,* § 10.02[B][5] ("[N]onexclusive licenses are revocable absent consideration."); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n. 12 (4th Cir.1994); *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp. 944, 947 (S.D.N.Y.1997); *Johnson v. Jones*, 885 F.Supp. 1008, 1013 n. 6 (E.D. Mich.1995). This is so because a nonexclusive license supported by consideration is a contract. *See Jacob Maxwell*, 110 F.3d at 752–53 (construing an implied nonexclusive license supported by consideration as an implied contract); *I.A.E.*, 74 F.3d at 776 ("[I]mplied licenses are like implied contracts. ...."); *Effects*, 908 F.2d at 559 n. 7 (noting that an implied license is "a creature of law much like any other implied-in-fact contract"); 3 Nimmer, *supra*, § 10.01[C][5] & n. 73.1 (observing that a license can be a form of contract in the sense that it is, "in legal contemplation, merely an agreement not to sue the licensee for infringement.").

*Lulirama*, 128 F.3d at 882.  The Fifth Circuit also dismissed Lulirama's argument that

it revoked any implied license that arose by filing the lawsuit, holding the same was

"tantamount to an argument that it had a unilateral right of rescission without

notice—an argument entirely inconsistent with the existence of a contract between

the parties. If Lulirama had the ability to terminate the license at will, then no contract

could exist because Lulirama's obligation under the contract would be illusory." *Id*.

at 882.  Similarly, another District Court has held that

> Plaintiff's grant of an implied nonexclusive license to Lo Duca,
> however, permitted Lo Duca "to take any action consistent with
> copyright ownership." *Lulirama*, 128 F.3d at 882. This includes
> distributing copies of Kolton's musical cues by sale or other transfer of
> ownership. *Id.* (implied nonexclusive license of musical jingle gave
> transferee right to reproduce and copy the jingles, prepare derivative
> works of the jingles, distribute copies of them by public sale or other
> transfer or ownership and authorize others to perform them).

*Kolton v. Universal Studios, Inc*.,  2004 WL 3242338, 4 (C.D. Cal. 2004).

Where no consideration is given, a nonexclusive implied license is revocable.

*See Avtec Sys. Inc. v. Peiffer*, 21 F.3d 568, 574 n. 12 (4th  Cir. 1994) (noting in

dictum that "an implied license is necessarily nonexclusive and revocable absent

consideration"); *see also Keane Dealer Services, Inc. v. Harts*, 968 F.Supp. 944, 947

(S.D.N.Y. 1997) ("If no consideration was given, the license was revocable, and the

institution of this lawsuit would constitute revocation.).   Thus, plaintiff's ability to

revoke the implied license is tied solely to consideration.  Neither party argues that they intended the defendants' permissive use to be of a limited duration, or that the consideration for the artwork paid by defendants was based on a time-limited use.

Thus, although the court finds the record does contain a factual dispute as to whether the defendants continued to use plaintiff's artwork after December 2009, the court also finds that this dispute is not material to the issues before this court.[12] Because plaintiff granted defendants an implied license in plaintiff's renderings, and because plaintiff received consideration for that license, the plaintiff could not unilaterally revoke his grant of a license by announcing that he did not receive the deal or the consideration he actually wanted.

In consideration of the forgoing, the court will grant summary judgment in the defendants' favor and against the plaintiff on the issue of whether the plaintiff revoked  his grant of an implied license.

---

[12]The plaintiff, relying on his own affidavit from his motion for reconsideration (doc. 57) as evidence of defendant's actions, asserts defendants' use of his work continued through 2012.  That affidavit in turn relies on what plaintiff states he printed from defendants' website at various times.  The defendants claim they removed plaintiff's renderings upon plaintiff's claim of copyright infringement.  Miller depo. (exhibit A to doc. 37) at 36, 117-118; see also plaintiff ex. 8 to doc. 39.  An email notice was sent to various defendant licensees stating "[t]he contractor was insisting upon payment from each RDH entity and our original intent was for RDH to have use of the art for each RDH division.  The contract language was vague and the contractor has not been reasonable in helping us to come to a solution.  As a result, we will be removing the renderings from the website and replacing them ASAP..." Plaintiff ex. 8 to doc. 39.  Patrick Miller stated he was unaware of any licensee of Red Door Homes who actually used the renderings provided by plaintiff.  Miller declaration (defendant exhibit C (doc. 37-2)), ¶ 3.  They hired someone else to redraw the renderings they were using.  Miller depo. (exhibit A to doc. 37) at 118-119.

### C.  Plaintiff's Procedural Issues:

Plaintiff claims that "Red Door Homes has apparently interpreted the District Court's request for implied license briefs as an extension of the deadline for filing of dispositive motions, using the opportunity to file a second motion for summary judgment inclusive of all of Karlson's claims....Karlson was not provided notice that dispositive motions would be presented against him..."  Plaintiff's brief (doc. 70) at 17-18.  The plaintiff offers no explanation for why he would think the court would request briefs if not for summary judgment.  To review for the plaintiff's benefit, the court granted summary judgment in favor of the defendants, and against the plaintiff, on the plaintiff's complaint.  The plaintiff appealed.  The Eleventh Circuit found that this court granted summary judgment on a ground not briefed by the parties.  This court thus provided the parties an opportunity to brief the issue.  The same was certainly not provided as an educational opportunity for the court or the parties, but rather was done on the grounds instructed by the Eleventh Circuit Court of Appeals. Neither this court nor the defendants were confused by the purpose of the court asking for briefing.  But of course, plaintiff did understand the purpose of the court asking for briefs, as the plaintiff argues "summary judgment cannot be entered on the basis of implied license."  Plaintiff's initial brief (doc. 70) at 17.  The court has also allowed the plaintiff to file a sur-reply, the defendant to file a sur-rebuttal and an

amended sur-rebuttal, and considered all of the pleadings filed to date. Plaintiff has been given all notice he is due as to the issues before the court, including fair warning that the court would actually rule on those issues.

## V. Conclusion

In accordance with the foregoing, the court shall grant summary judgment in favor of the defendants and against the plaintiff on the issue of implied license. Specifically, the court finds no genuine issue of material fact remains in the case. The plaintiff granted defendants an implied license to use his renderings, and the defendants paid plaintiff for this use, making their license irrevocable. This finding disposes of all of the claims in this case.

**DONE** and **ORDERED** this 30th day of April, 2014.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE